UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JEFF COLEMAN,                              )   Case No. 07-CV-1722-JM (JMA)
                                           )
                    Plaintiff,             )   **ORDER (1) GRANTING PLAINTIFF'S**
                                           )   **MOTION FOR SUMMARY JUDGMENT**
v.                                         )   **[DOC. NO. 11] (2) DENYING**
                                           )   **DEFENDANT'S CROSS-MOTION FOR**
MICHAEL J. ASTRUE, Commissioner )              **SUMMARY JUDGMENT [DOC. NO.**
of Social Security,                        )   **16], AND (3) REMANDING CASE**
                                           )   **FOR FURTHER PROCEEDINGS**
                    Defendant.             )
                                           )

        Plaintiff Jeff Coleman ("Plaintiff") seeks judicial review

of Defendant Social Security Commissioner Michael J. Astrue's

("Defendant") determination that he is not entitled to disability

insurance and supplemental security income benefits.  The parties

have filed cross-motions for summary judgment.  Pursuant to 28

U.S.C. § 636(b)(1)(B) and Civil Local Rule 72.1(c)(1)(c), the

motions were originally referred to Magistrate Judge Jan M. Adler

for a Report and Recommendation.  The Court hereby withdraws the

referral and finds these matters suitable for determination.

//

//

1    As set forth below, the Court **GRANTS** Plaintiff's motion for

2  summary judgment, **DENIES** Defendant's cross-motion for summary

3  judgment, and remands the case for further proceedings.

4  **I.   PROCEDURAL HISTORY**

5    Plaintiff filed an application for disability insurance

6  benefits on or around June 3, 2005 alleging a disability onset

7  date of January 1, 2002.  (Admin. R. at 15, 72-74.)  Plaintiff

8  also protectively filed an application for supplemental security

9  income on April 29, 2005.  (Id. at 15, 487-89.)  Plaintiff's

10 disability claim was denied initially on July 25, 2005, and again

11 upon reconsideration.  (Id. at 61-71.)  Plaintiff requested a

12 hearing before an Administrative Law Judge ("ALJ").

13 Administrative hearings were conducted on November 20, 2006 and

14 January 18, 2007 by ALJ James S. Carletti, who determined that

15 Plaintiff was not disabled.  (Id. at 15-23.)  Plaintiff requested

16 a review of the ALJ's decision; the Appeals Council for the

17 Social Security Administration ("SSA") denied Plaintiff's request

18 for review on May 24, 2007.  (Id. at 8-10.)  Plaintiff then

19 commenced this action pursuant to 42 U.S.C. § 405(g).

20 **II.   FACTUAL BACKGROUND**

21   Plaintiff was born on June 15, 1956.  (Id. at 72.)  He has

22 previously worked as a grocery store bagger, molder at a

23 manufacturing plant, customer service representative, stock

24 person, and production mechanic.  (Id. at 102.)  Plaintiff has

25 never been married and does not have any children.  (Id. at 72,

26 224.)  He lives with his older brother, James Coleman, in a

27 trailer inherited from their mother, in a senior trailer park

28 community.  (Id. at 273.)

07cv1722

**III.  MEDICAL EVIDENCE**

**A.   Dr. Joel Juarez Uribe, Sharp Healthcare Chula Vista**

Plaintiff was seen at Sharp Healthcare in March and June 2002 for hypertensive cardiovascular disease, high blood pressure, anxiety, hyperlipidemia (elevated level of lipids in blood), and chronic obstructive pulmonary disease. (Id. at 173-76.)  A chest CT scan taken in July 2002 was unremarkable. (Id. at 177.)

**B.   South Bay Guidance Center - Treating Psychiatrist (2003)**

Plaintiff was first seen at the South Bay Guidance Center in March 2003 at the referral of his primary care physician. (Id. at 260.)  He reported that he started drinking alcohol and using marijuana at the age of 11, used speed at age 14, and sold speed in high school.  The peak of his substance abuse was in the mid-1980s.  He stated that he had been clean for five years.  He complained of anxiety, worry, hopelessness, helplessness, fear of relapsing, depressed mood, and fear of being unable to care for his elderly mother, with whom he then lived. (Id.)  His primary care doctor had prescribed Paxil and Diazepan (Valium); he was not satisfied with the Valium and had finished the bottles early. (Id.)  Plaintiff was instructed to discontinue the Valium, and was prescribed Buspar (for anxiety) and Klonopin (a benzodiazepine used to produce a calming effect). (Id. at 259.)

**C.   San Ysidro Health Center - Treating Physician(s) (2004)**

Plaintiff was seen at the San Ysidro Health Center during the early part of 2004. (Id. at 321-36.)  In February 2004, he admitted that he had been taking more Klonopin than he should but stated that his anxiety had been overwhelming. (Id. at 324.)

3

His physician agreed to fill the prescription but warned
Plaintiff that all further refills had to come from his
psychiatrist.  (Id.)  The following month, Plaintiff complained
of pain in both legs and feet.  (Id. at 323.)  In April 2004, he
had an anxiety attack and reported that he had been discharged
from treatment at the South Bay Guidance Center.  (Id. at 322.)
The doctor discovered that Plaintiff had been discharged for
misuse of "benzo" (benzodiazepine) and that he exhibited symptoms
of benzo withdrawal.  (Id.)

**D.   Alvarado Hospital (December 31, 2004 - January 2, 2005)**

        Plaintiff was admitted into Alvarado Hospital between
December 31, 2004 and January 2, 2005 with complaints of a panic
attack and tachycardia (rapid heartbeat).  (Id. at 179.)  He had
been trying to enter a detoxification facility but was shaky and
had a fever so was taken to the hospital.  (Id. at 183.)
Plaintiff was diagnosed with pneumonia.  (Id. at 179.)  He was
also found to have an elevated level of alcohol in his body.
(Id. at 179.)  He reported that he drank one quart of alcohol
daily and that his last drink had been the previous morning.
(Id. at 185.)  He discharged himself from the hospital without
telling any of the medical staff.  (Id. at 179.)

**E.   Scripps Memorial Chula Vista (January 2005)**

        The day after walking out of Alvarado Hospital, Plaintiff
presented to the emergency room at Scripps Memorial Chula Vista
with complaints of chest pain, shortness of breath, shakes, and
jitters.  (Id. at 223.)  He explained that he had left Alvarado
Hospital against medical advice as he felt he had been receiving
poor care there.  (Id.)  He advised that he had been hospitalized

07cv1722

for alcohol and drug use numerous times in the past, and admitted
to drinking one quart of whiskey or other heavy alcohol per day.
(Id. at 224.)  Plaintiff was treated for his pneumonia and
released.  (Id. at 229.)

**F.    San Ysidro Health Center - Treating Physician(s) (2005)**

Plaintiff admitted to increased alcohol consumption and
requested medication for anxiety during a visit to the San Ysidro
Health Center in early 2005.  (Id. at 320.)  He was given a trial
prescription of Zoloft, but elected to take Paxil instead.  (Id.
at 319-20.)  He complained of headaches, as well as joint,
muscle, knee and back pain.  (Id. at 317-18.)  X-rays taken in
April 2005 showed mild degenerative changes in both knees and an
old compression fracture at L3.  (Id. at 212-14, 316.)  Plaintiff
was referred to physical therapy, which he attended from May to
June 2005.  (Id. at 206-11, 256-58, 316.)  Bilateral knee x-rays
taken in June 2005 showed only minimal patella spurring.  (Id. at
371.)

Plaintiff continued to be seen during 2005 for chronic low
back pain, for which he was prescribed a fentanyl patch and given
referrals for pain management, an orthopedic evaluation, and
physical therapy.  (Id. at 309-11, 313-15.)

**G.    UCSD Medical Center (2005)**

Plaintiff underwent an orthopedic consultation in September
2005 at the UCSD Medical Center in Hillcrest for his low back
pain.  (Id. at 384-86.)  He described his pain as aching and
stated that he had injured his back after falling off of a truck
in 1995.  (Id. at 385.)  Although he had previously been able to
manage his pain with various medications, including Vicodin and

07cv1722

Fentanyl patches, his pain had gotten progressively worse.  (Id.)
After Dr. Yo-Po Lee, an orthopedic surgeon, discussed the risks
and benefits of surgical intervention, Plaintiff advised that he
was not interested in surgery.  (Id.)  Dr. Lee referred Plaintiff
to a pain management physician.

Plaintiff visited the UCSD Pain Clinic the following month
and saw Dr. Albert Y. Lung.  (Id. at 383-84.)  Plaintiff
described his back pain level as 8 on a scale of 10, but declined
having any radiating pain into his legs.  (Id. at 383.)  Dr. Lung
reviewed Plaintiff's lumbar MRI findings from August 26, 2005 and
opined that Plaintiff's low back pain was probably being caused
by the L3 compression fracture.  (Id. at 383-84, 467-68.)  Dr.
Lung indicated that there was nothing the Pain Clinic could offer
Plaintiff to treat his pain, and recommended that Plaintiff see
Interventional Radiology for vertebroplasty, a surgical
treatment, for pain relief.  (Id. at 384.)

**H.    South Bay Guidance Center - Treating Psychiatrist (2005)**

Plaintiff returned to the South Bay Guidance Center in April
2005 and was seen by Dr. Alexander Papp.  (Id. at 255.)  He
reported that he was feeling "worse again" because his brother
had been pressuring him to look for a job.  He advised that he
had last worked a year previously, and was let go from a box boy
job at Vons after a 60 day trial period.  (Id.)  Plaintiff
advised that his brother was supporting him and that this created
tension between the two of them.  Plaintiff's medications
included Trazodone (for insomnia), Klonopin (for agitation),
Depakote (for mood swings), and Effexor (for anxiety and
agoraphobia).  Plaintiff requested that his dosage of Klonopin be

doubled, but Dr. Papp declined to do so due to Plaintiff's prior history of drug abuse. (<u>Id.</u>) Dr. Papp switched Plaintiff to Effexor for his anxiety and agoraphobia as Paxil CR was no longer on the market. (<u>Id.</u>)

Dr. Papp indicated that Plaintiff's diagnoses included depressive disorder in partial remission and polysubstance abuse in remission, and questioned whether Plaintiff had bipolar traits. (<u>Id.</u> at 240.) In later visits in 2005, Dr. Papp noted that Plaintiff was less nervous outside of the home, had occasional tearfulness when he thought about his mother, who had recently passed away, and was having trouble sleeping. (<u>Id.</u> at 244-48.) Plaintiff continued having serious conflicts with his brother and also had a falling out with his AA sponsor. (<u>Id.</u> at 242-45, 357-62.)

**I.   Dr. Sandra Eriks, Seagate Medical Group –
      Examining Physician (2005)**

Plaintiff underwent an internal medicine evaluation with Dr. Sandra Eriks of Seagate Medical Group on December 19, 2005 at the request of the Department of Social Services. (<u>Id.</u> at 268-71.) Plaintiff reported that he lived with his brother and that they supported themselves on his brother's Social Security Disability. (<u>Id.</u> at 269.) Dr. Eriks observed that Plaintiff was "somewhat somnolent" and "very slowed," which she attributed to the use of high-dose narcotics. (<u>Id.</u> at 271.) She reported that Plaintiff had a long-standing history of low back pain, and opined that Plaintiff had the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 2 hours out of an 8 hour day, and sit for 2 hours out

1  of an 8 hour day.  (Id.)

2  **J.   Dr. Jaga Nath Glassman - Examining Psychiatrist (2005)**

3      Plaintiff received a psychiatric disability evaluation from

4  Dr. Jaga Nath Glassman on December 23, 2005 at the request of the

5  Department of Social Services.  (Id. at 273-77.)  Plaintiff

6  explained that he had last worked in 2001 at Vons, and that he

7  was let go after two months because he "didn't fit in" in terms

8  of "the mental aspects."  (Id. at 273.)  Plaintiff stated that he

9  felt incapable of working because he did not get along with

10  people and because of his depression, anxiety, and anger issues.

11  (Id. at 274.)

12      Dr. Glassman concluded:

13      This 49-year-old single Caucasian male describes
        longstanding problems of not fitting i[n], identity
14      confusion, feeling "lonely," low self-esteem, labile
        affect states, and intermittent depression and anxiety.
15      He also apparently has an extensive history of
        polysubstance abuse, that he denied to me during the
16      interview.  [¶]  In formal diagnostic terms, one might
        consider the following:

17
        Axis I - Dysthymic Disorder; Apparent Polysubstance
18      Abuse - In Remission - Including Alcohol and Possibly
        Methamphetamine; Ongoing Benzodiazepine Dependence (6
19      mg of clonazepam a day).

20      Axis II - Borderline Personality Features; Possible
        Borderline Intellectual Functioning.
21
        Axis III - Obesity, hypertension.
22

23  (Id. at 276-77.)

24  **K.   Various Hospitals (2006)**

25      Plaintiff was seen at the emergency room at Scripps Mercy

26  Hospital on January 22, 2006.  (Id. at 396-97.)  The doctor was

27  initially unable to ascertain Plaintiff's problems, but was

28  eventually able to do so upon the arrival of Plaintiff's brother.

8

1   (<u>Id.</u> at 396.)  It came out that Plaintiff had stolen some of his

2   brother's medications, used them to buy alcohol, and had been

3   drinking heavily for the past few days.  (<u>Id.</u>)  The emergency

4   room physician advised Plaintiff to return to his treating

5   doctors at the San Ysidro Health Center and to restart his

6   Vicodin and Fentanyl patches, which Plaintiff had been without

7   for 5-10 days.  (<u>Id.</u> at 397.)

8        On February 5, 2006, Plaintiff's sponsor took Plaintiff to

9   the emergency room at Sharp Memorial Hospital after he overdosed

10  on Klonopin.  (<u>Id.</u> at 409.)  He had taken a total of 90 Klonopin

11  tablets because he "wanted to die."  (<u>Id.</u>)  He stated that he was

12  experiencing feelings of worthlessness, hopelessness, and guilt

13  after stealing from his brother.  (<u>Id.</u>)  Plaintiff reported that

14  he was a binge drinker, and the doctor noted that Plaintiff had

15  been dependent upon opiates and benzodiazepines.  (<u>Id.</u>)

16  Plaintiff's diagnoses included psychiatric decompensation,

17  obesity, chronic back pain, history of lumbar compression

18  fracture, alcoholism, hypertension, and hyperlipidemia.  (<u>Id.</u> at

19  410.)  Plaintiff stayed at the hospital until February 13, 2006,

20  when he was discharged to the Jary Barreto Crisis Center.  (<u>Id.</u>

21  at 411, 445-56.)  He stayed there until February 28, 2006, at

22  which time he was discharged to his brother's house following an

23  agreement between Plaintiff, his brother, and Dr. Jennifer Poast

24  of San Ysidro Health Center regarding the administering of

25  Plaintiff's medications.  (<u>Id.</u> at 304, 445.)

26       Following his stay at the crisis center, Plaintiff appeared

27  to be doing better as Seroquel, an antipsychotic mediation, had

28  been added to his medication regimen.  (<u>Id.</u> at 346-53.)  It was

07cv1722

noted, however, that Plaintiff appeared to be either drinking too much or taking too much of his medications. (<u>Id.</u> at 341.)

Plaintiff was admitted into Scripps Mercy Hospital between July 7 and 11, 2006 following another suicide attempt. (<u>Id.</u> at 398-407.)  Plaintiff reported that he and his brother had had an argument, and that he had relapsed to whiskey after being sober for six months. (<u>Id.</u> at 400.)  Plaintiff had also stopped taking his medications. (<u>Id.</u> at 401.)  Plaintiff was diagnosed with severe depression, and was discharged once he had stabilized. (<u>Id.</u> at 398, 401-02.)

**L.    South Bay Guidance Center - Treating Psychiatrist (2006)**

As of July 25, 2006, Plaintiff was taking Trazodone, Klonopin, Seroquel, and Cymbalta for his psychiatric issues. (<u>Id.</u> at 460.)  Dr. Papp noted that Depakote and Effexor had been discontinued, and prescribed Cymbalta for use as an antidepressant. (<u>Id.</u> at 459.)  Plaintiff appeared to have good results with Cymbalta. (<u>Id.</u> at 462, 464, 486.)

On October 24, 2006, Dr. Papp completed a Psychiatric Review Form on behalf of Plaintiff. (<u>Id.</u> at 378-81.)  He noted that Plaintiff's diagnosis was Depressive Disorder, and that his current Global Assessment of Functioning ("GAF") score was 39.[1] (<u>Id.</u> at 378.)  He opined that Plaintiff's symptoms adversely

---

[1] The Global Assessment of Functioning scale, or GAF scale, is a numeric scale (0 through 100) used by mental health practitioners to rate social, occupational, and psychological functioning, with lower numbers representing more severe symptoms, difficulties, or impairments.  The scale is presented in the Diagnostic and Statistical Manual of Mental Disorders.  A GAF score between 31 and 40 suggests "Some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Fourth Edition Text Revision (2000).

07cv1722

affected his functioning such that he would be absent from a job
more than three times per month, that Plaintiff had "marked"
limitations in three areas of functioning, and that Plaintiff
would experience one or two repeated episodes of decompensation.
(Id. at 380-81.)  In a letter to Plaintiff's counsel dated
November 7, 2006, Dr. Papp wrote that Plaintiff had stopped using
stimulants four years before and alcohol two years before, and
that "[h]is mood swings, depression, [and] anxiety, have all
continued to remain [the] focus of attention after he had
attained full sobriety."  (Id. at 465.)

**IV.   THE ADMINISTRATIVE HEARING**

The ALJ conducted administrative hearings on November 20,
2006 and January 18, 2007.  (Id. at 499, 525.)

**A.   First Administrative Hearing**

**1.   Plaintiff's Testimony**

Plaintiff testified that he lives with his brother and that
his brother supports him.  (Id. at 502-03.)  He denied abusing
benzodiazepine.  (Id. at 503.)  He stated that he was unable to
work because of his back impairment.  (Id. at 505.)  He testified
that he feels depressed off and on every day, has problems
communicating with others, doesn't "fit in," and has short term
memory problems, low concentration, and a low comprehension
level.  (Id. at 505-08.)  He also stated that he does not finish
things he starts, and feels nervous and anxious around people.
(Id. at 508-09.)  He testified that he last drank alcohol a year
before.  (Id. at 510.)  He stated that he can walk only a block
before feeling back pain, has pain after standing for 30 minutes,
and has to adjust every 20-30 minutes when sitting.  (Id. at

511.)

### 2.   Medical Expert Testimony

Walter Doren, M.D., an orthopedist, testified as a medical expert ("ME") at the first administrative hearing.  Dr. Doren testified that Plaintiff had an old compression fracture at L3, but the quantification of the degree was not expressed in the x-rays that were presented.  (Id. at 515.)  He stated that Plaintiff did not meet or equal any of the listings in the Listing of Impairments in relation to his spinal cord because there was no description of any substantial deformation concerning Plaintiff's L3 vertebral fracture and because the records indicated that Plaintiff did not have any neurological deficits.  (Id. at 515-17.)  Though he stated that he agreed with Dr. Eriks' opinion regarding Plaintiff's RFC, Dr. Doren testified that Plaintiff was capable of standing or walking for 6 hours and sitting for 6 hours out of an 8 hour day.  (Id. at 517; contra id. at 271 [setting forth Dr. Eriks' opinion that Plaintiff could stand or walk for 2 hours and could sit for 2 hours out of an 8 hour day].)  Dr. Doren also testified that Plaintiff would require a sit/stand option.  (Id. at 517.)  In response to questioning by Plaintiff's counsel, Dr. Doren testified that he could not comment on Plaintiff's lumbar MRI findings as he had not seen the MRI report.  (Id. at 518.)

### 3.   Vocational Expert Testimony

Vocational expert ("VE") witness Mary Jesko testified at the first administrative hearing.  In response to a hypothetical question posed by the ALJ, the VE testified that a person with a sit/stand option, limited to occasional bending and crawling,

07cv1722

1  limited to simple, repetitive tasks, with no public contact and

2  minimal interaction with coworkers and supervisors, could not

3  perform Plaintiff's prior work.  (Id. at 520-21.)  However, such

4  a person could perform work as a small parts assembler, textile

5  filler, and gluer.  (Id. at 521-22.)  Upon questioning by

6  Plaintiff's counsel, the VE stated that a person limited to the

7  RFC put forth by Dr. Eriks (see id. at 271) could not perform

8  these jobs on a full-time, 40 hour per week basis because of the

9  two hour limitations upon standing or walking and sitting.  (Id.

10 at 523.)

11 **B.    Second Administrative Hearing**

12        Sidney Bolter, M.D., a Board-certified psychiatrist,

13 testified as a ME at the second administrative hearing.  (Id. at

14 527.)  Dr. Bolter testified that Plaintiff did not meet or equal

15 any of the psychiatric or psychological listings.  (Id. at 529-

16 30.)  He further opined:

17        My diagnosis here, when you put it all together, is
          depression NOS [not otherwise specified] with the --
18        the actual decompensations which he was in the hospital
          were related to substances.  His depression,
19        nevertheless, without substances is moderate, moderate
          for activities, moderate for social functioning, mild
20        but I would restrict him to simple, repetitive tasks,
          non-public.  He should be okay with supervisors and
21        coworkers.  And decompensation with the substances,
          according to the record, would be about three; and
22        without would just be one to two, being that he's in
          treatment.

23

24 (Id. at 531.)

25 **V.   THE ALJ DECISION**

26        After considering the record, ALJ Carletti made the

27 following findings:

28        .  .  .  .

13

2.  The claimant has not engaged in substantial gainful
    activity at any time relevant to this decision
    [citations omitted].

3.  The claimant has the following severe impairments:
    degenerative disc disease, degenerative joint disease,
    depressive disorder, anxiety disorder, and
    polysubstance dependence [citations omitted].[2]

    . . . .

4.  Without polysubstance dependence, the claimant does not
    have an impairment or combination of impairments that
    meets or medically equals one of the listed impairments
    in [the Social Security Regulations].  With
    polysubstance dependence, the claimant's impairments
    meet the criteria of medical listings 12.04, 12.06, and
    12.09 [citations omitted].

5.  After careful consideration of the entire record,
    the undersigned finds that the claimant has the
    residual functional capacity, without
    polysubstance dependence, to perform light work,
    with a sit/stand option, and occasional bending or
    crawling, involving simple repetitive tasks in
    nonpublic settings.

    . . . .

6.  The claimant is unable to perform any of his past
    relevant work as a bagger, molder, or stocker.  So
    opined the vocational expert, and I concur and so find
    [citation omitted].

    . . . .

10. Considering the claimant's age, education, work
    experience, and residual functional capacity without
    polysubstance dependence, there are jobs that exist in
    significant numbers in the national economy that the
    claimant can perform [citations omitted].

    . . . .

---

[2]"An 'individual shall not be considered to be disabled for
purposes of [benefits under Title II or XVI of the Act] if alcoholism
or drug addiction would . . . be a contributing factor material to the
Commissioner's determination that the individual is disabled.'"
Bustamonte v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42
U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  According to the SSA's
implementing regulations, "If we find that you are disabled and have
medical evidence of your drug addiction or alcoholism, we must
determine whether your drug addiction or alcoholism is a contributing
factor material to the determination of disability."  20 C.F.R. §§
404.1535(a), 416.935(a).

11.  The claimant's polysubstance dependence is a
     contributing factor material to the determination
     of disability, and the claimant has not been
     entitled to or eligible for Social Security
     benefits pursuant to Titles II or XVI of the
     Social Security Act, from January 1, 2002, through
     the date of this decision [citations omitted].

(Id. at 17-22.)

VI.  **STANDARD OF REVIEW**

To qualify for disability benefits under the Social Security

Act, an applicant must show that:  (1) He or she suffers from a

medically determinable impairment that can be expected to result

in death or that has lasted or can be expected to last for a

continuous period of twelve months or more, and (2) the

impairment renders the applicant incapable of performing the work

that he or she previously performed or any other substantially

gainful employment that exists in the national economy.  See 42

U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must meet both

requirements to be "disabled."  Id.  Further, the applicant bears

the burden of proving that he or she was either permanently

disabled or subject to a condition which became so severe as to

disable the applicant prior to the date upon which his or her

disability insured status expired.  Johnson v. Shalala, 60 F.3d

1428, 1432 (9th Cir. 1995).

A.  **Sequential Evaluation of Impairments**

The Social Security Regulations outline a five-step process

to determine whether an applicant is "disabled."  The five steps

are as follows:  (1) Whether the claimant is presently working in

any substantial gainful activity.  If so, the claimant is not

disabled.  If not, the evaluation proceeds to step two.

(2) Whether the claimant's impairment is severe.  If not, the

15

claimant is not disabled.  If so, the evaluation proceeds to step three.  (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four.  (4) Whether the claimant is able to do any work he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.    Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless: (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000).  Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's

07cv1722

conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (citing Andrews, 53 F.3d at 1039).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Vasquez, 547 F.3d at 1104 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g).  The matter may also be remanded to the SSA for further proceedings.  Id.

## VII.  DISCUSSION

### A.  The ALJ Erred by Failing to Consider James Coleman's Lay Witness Testimony

Plaintiff first argues that the ALJ erred by failing to address the third party statements of Plaintiff's brother, James Coleman ("James"), in his decision.  (Pl.'s Mem. at 20-22.) Defendant argues in response that the ALJ's failure to discuss James' statements was harmless as the statements were not probative and would not have significantly impacted the ALJ's decision.  (Def.'s Opp'n at 4-6.)

In the Ninth Circuit, "the ALJ is required to account for all lay witness testimony in the discussion of his or her findings."  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (citing Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent

evidence that an ALJ must take into account, unless he or she
expressly determines to disregard such testimony and gives
reasons germane to each witness for doing so.")).  "[L]ay witness
testimony as to a claimant's symptoms or how an impairment
affects ability to work *is* competent evidence . . . and therefore
*cannot* be disregarded without comment." Nguyen v. Chater, 100
F.3d 1462, 1467 (9th Cir. 1996) (emphasis in original).  "[W]here
the ALJ's error lies in a failure to properly discuss competent
lay testimony favorable to the claimant, a reviewing court cannot
consider the error harmless unless it can confidently conclude
that no reasonable ALJ, when fully crediting the testimony, could
have reached a different disability determination." Stout v.
Comm'r, 454 F.3d 1050, 1056 (9th Cir. 2006).

Here, James Coleman completed four "Function Report Adult -
Third Party" forms, presumably at the behest of the SSA, between
May and October 2005. See Admin. R. at 80-88, 110-18, 127-34 and
151-58.  James reported, *inter alia*, that he needed to explain
things more than once to Plaintiff, and that Plaintiff complained
that it hurt to do things, did not sleep regularly, could only
watch television, had stopped all activities because his back
condition was getting worse, could stand for only 10-15 minutes,
forgot a lot, stopped jobs in the middle of doing them, could not
understand simple things, and could pay attention for only 10-20
minutes. (Id. at 115, 152, 155, 156.)  Such testimony, if fully
credited, supports a conclusion that Plaintiff is unable to work.
"[F]riends and family members in a position to observe a
claimant's symptoms and daily activities are competent to testify
as to [his] condition." Dodrill v. Shalala, 12 F.3d 915, 918-99

1   (9th Cir. 1993).  The ALJ, who wholly failed to mention James'
2   reports about Plaintiff's impairments in his decision, thus
3   erred.  See, e.g., Stout, 454 F.3d at 1054; see also Bruce v.
4   Astrue, --- F.3d ----, 2009 WL 539945 (9th Cir. Mar. 5, 2009)
5   (finding that the ALJ failed to adequately address competent lay
6   witness testimony provided by the claimant's wife).

7       Defendant argues that the ALJ's failure was harmless as the
8   reports submitted by James were not probative.  The Court
9   disagrees.  Numerous regulations direct the ALJ to consider,
10  throughout the sequential process, lay testimony and/or evidence
11  by non-medical sources concerning the severity of a claimant's
12  impairment and the claimant's ability to work.  See, e.g., 20
13  C.F.R. §§ 404.1513(d)(4), 404.1529(c)(3), 404.1545(a)(3),
14  416.913(d)(4), 416.929(c)(3), 416.945(a)(3).  Furthermore, the
15  Ninth Circuit specifically noted in Stout that no legal
16  authorities have concluded that an ALJ's silent disregard of lay
17  testimony was harmless.  See Stout, 454 F.3d at 1055-56.
18  Defendant has provided no authority to the contrary.

19      In sum, the Court cannot conclude that if James' testimony
20  were fully credited, no reasonable ALJ could find Plaintiff fully
21  disabled and unable to work.  Accordingly, the Court cannot
22  conclude that the ALJ's error in failing to consider James'
23  competent lay testimony was harmless.  See id. at 1056.  The
24  Court therefore remands this matter for further proceedings
25  regarding James Coleman's lay testimony concerning Plaintiff's
26  symptoms and ability to work.
27  //
28  //

07cv1722

**B.     Remand is Required to Ascertain the Effect of Plaintiff's MRI Findings Upon Dr. Doren's Opinions**

Plaintiff next argues that the RFC assigned to Plaintiff by the ALJ is not supported by substantial evidence as it is based upon the conclusions of Dr. Doren, one of the MEs, whose opinion did not incorporate all of Plaintiff's objective medical evidence.  (Pl.'s Mem. at 22-25.)  Specifically, Plaintiff contends that Dr. Doren's opinion did not take Plaintiff's lumbar MRI findings into consideration.  (*Id.* at 23-25.)[3]  Defendant argues in response that Plaintiff's MRI findings were not as important as evidence regarding his actual functioning, that Plaintiff did not submit the MRI report to the ALJ in a timely manner, and that the ALJ was under no obligation to provide the MRI findings to Dr. Doren for comment after the November 20, 2006 hearing.  (Def.'s Opp'n at 6-9.)

Plaintiff's lumbar MRI dated August 26, 2005 demonstrated that Plaintiff had "Severe L2-3, moderate L3-4, and mild L4-5 multi-level acquired lumbar central canal stenosis[,] . . . Moderately severe bilateral L3 and moderate bilateral L4 lateral recess stenosis[, and] Moderate bilateral L2-3 and mild bilateral L3-4 foraminal stenosis."  (Admin. R. at 468.)  It also showed an "Old moderately severe anterior wedge shape superior L3 vertebral body compression fracture with 5 mm posterior-superior

---

[3]Plaintiff actually argues that Dr. Doren did not take Plaintiff's lumbar *and* cervical MRI results into consideration, and refers to the report located on page 469 of the administrative record as a report of a cervical MRI.  That report, however, is a report of cervical *x-rays* ordered by Dr. Donald Vance during Plaintiff's emergency room visit on September 12, 2005.  (*See* Admin. R. at 203-05, 469.)  There does not appear to be a report of a cervical MRI in the record.

retropulsed component." (Id.)  Lumbar spinal stenosis is a
condition in which either the spinal canal (central stenosis) or
vertebral foramen (foraminal stenosis) becomes narrowed.  See
http://www.medicinenet.com/lumbar_stenosis/article.htm (as
visited Mar. 6, 2009).  If the narrowing is substantial, it can
cause nerve compression, which results in back pain.  Id.

In his testimony at the first administrative hearing, Dr.
Doren, who had reviewed the brief summary of the MRI contained in
the report of Dr. Wong of the UCSD Pain Clinic (see Admin. R. at
389), but had not reviewed the MRI report itself, commented,
"[U]nfortunately, there was not any record of the MRI in the
exhibits that were provided for me." (Id. at 515-16.)  Dr. Doren
also stated that the "quantification of the degree" of
Plaintiff's L3 compression fracture was not contained in
Plaintiff's lumbar x-ray report, which he had reviewed (see id.
at 212, 514-55), and that he could not assess Plaintiff's central
canal stenosis because he did not have the MRI report (see id. at
518).  Therefore, although Dr. Doren found that Plaintiff did not
exhibit any neurological deficits (see id. at 517), as Dr.
Doren's own testimony clearly shows, the lumbar MRI report would
have permitted his opinions to be more accurate and complete.
Dr. Doren would have been able to properly evaluate the extent
and severity of Plaintiff's L3 compression fracture and spinal
stenosis, and the impact of those findings on Plaintiff's RFC.

Defendant asserts that Plaintiff did not submit the MRI
report in a timely manner and that the ALJ was under no
obligation to provide the MRI findings to Dr. Doren for comment
after the November 20, 2006 hearing.  According to the record,

1  Plaintiff's counsel submitted the MRI report, along with other

2  records, *one day* after the first administrative hearing,

3  apparently after realizing that the record did not contain those

4  reports.  (See id. at 466-68.)

5      The ALJ in a social security case has a "special duty to

6  fully and fairly develop the record and to assure that the

7  claimant's interests are considered." Smolen v. Chater, 80 F.3d

8  1273, 1288 (9th Cir. 1996) (citation omitted).  This duty exists

9  even when the claimant is represented by counsel.  Brown v.

10  Heckler, 713 F.2d 441, 443 (9th Cir. 1983).  The ALJ's duty to

11  develop the record is triggered when there is ambiguous evidence

12  or when the record is inadequate to allow for the proper

13  evaluation of the evidence.  Mayes, 276 F.3d at 459-60.  The ALJ

14  may discharge this duty in several ways, including by subpoenaing

15  the claimant's physicians, submitting questions to the claimant's

16  physicians, continuing the hearing, or keeping the record open

17  after the hearing to allow supplementation of the record.

18  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

19      Given the ALJ's duty to fully develop the record, as well as

20  his reliance on Dr. Doren's opinions, it would have been prudent

21  for the ALJ to provide the MRI report to Dr. Doren for evaluation

22  and comment, even after the first administrative hearing had

23  taken place.  This is especially true considering that the

24  subject record was provided immediately after the hearing and

25  well in advance of both the ALJ's decision, which was issued on

26  February 9, 2007, as well as the second administrative hearing,

27  which took place on January 18, 2007.  The ALJ easily could have

28  provided the MRI report to Dr. Doren and requested that Dr. Doren

1    provide supplemental testimony at the second hearing.  In failing

2    to do so, he failed to fulfill his duty to fully develop the

3    record, and thus erred.

4         The Court directs that upon remand, the ALJ shall conduct

5    further proceedings in order to obtain an opinion from Dr. Doren

6    or other ME which takes all of the pertinent medical evidence

7    into account, including Plaintiff's 2005 lumbar MRI findings.

8    **C.    The ALJ Did Not Err by Not Incorporating "One or Two**
         **Episodes of Decompensation" Into Plaintiff's RFC**
9

10        Plaintiff argues that the ALJ erred in formulating

11   Plaintiff's RFC by not properly accounting for significant work

12   absences caused by episodes of decompensation.  (Pl.'s Mem. at

13   25-26.)  Plaintiff observes that although the ALJ stated that

14   Plaintiff would have "one or two episodes of decompensation"

15   without polysubstance dependence (see Admin. R. at 18), the ALJ

16   did not include this finding in his assessment of Plaintiff's

17   RFC.  Defendant argues in response that the ALJ did not find that

18   Plaintiff had a RFC that included extended periods of

19   decompensation, and that Plaintiff has erroneously conflated

20   "preliminary evidentiary findings" with the ALJ's ultimate RFC

21   determination.  (Def.'s Opp'n at 9-12.)

22        Plaintiff's arguments rest on two erroneous assumptions.

23   First, "episodes of decompensation" are defined as "exacerbations

24   or temporary increases in symptoms or signs accompanied by a loss

25   of adaptive functioning."  20 C.F.R. pt. 404, subpt. P, app. 1, §

26   12.00C(4).  Each such episode does *not*, as Plaintiff contends,

27   necessarily last for at least two weeks.  See Pl.'s Mem. at 26.

28   Rather, it is episodes of *extended* duration that are defined as

lasting for at least two weeks.  <u>See</u> 20 C.F.R. pt. 404, subpt. P,
app. 1, § 12.00C(4).  The language of Listing 12.00 makes it
clear that it is possible for episodes of decompensation to be of
a shorter duration than two weeks.  <u>See</u> <u>id.</u>  Therefore,
Plaintiff's assumption that the one or two episodes of
decompensation described by Dr. Bolter and the ALJ would result
in Plaintiff missing two two-week periods of work each year is
erroneous.

     Second, Defendant is correct that the ALJ's finding, based
upon Dr. Bolter's testimony, that Plaintiff would have one or two
periods of decompensation related not to the RFC determination at
steps four and five of the sequential evaluation process, but
rather to the determination at step two whether Plaintiff's
mental impairments were severe (as well as to the step three
analysis).  The psychiatric review technique described in 20
C.F.R. §§ 404.1520a and 416.920a requires the ALJ to assess a
claimant's limitations and restrictions from a mental impairment
in categories identified as the "paragraph B" and "paragraph C"
criteria of the adult mental disorders listings.  SSR 96-8P, 1996
WL 374184, at *4; 20 C.F.R. §§ 404.1520a, 416.920a.  "Episodes of
decompensation" are one of the four components of the paragraph B
criteria.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.  SSR
96-8P expressly provides, "The adjudicator must remember that the
limitations identified in the 'paragraph B' and 'paragraph C'
criteria *are not an RFC assessment* but are used to rate the
severity of mental impairment(s) at steps 2 and 3 of the
sequential evaluation process."  SSR 96-8P, 1996 WL 374184, at *4
(emphasis added).  "RFC is a multidimensional description of the

07cv1722

1  work-related abilities you retain in spite of your medical

2  impairments.  An assessment of your RFC complements the

3  functional evaluation necessary for paragraphs B and C of the

4  listings by requiring consideration of an expanded list of work-

5  related capacities that may be affected by mental disorders when

6  your impairment(s) is severe but neither meets nor is equivalent

7  in severity to a listed mental disorder."  20 C.F.R. pt. 404,

8  subpt. P, app. 1, § 12.00A.  Thus, the determination of a

9  claimant's RFC is distinct from the examination of the degree of

10  functional limitation that takes place when assessing whether a

11  claimant's impairment is "severe" at step two or whether it meets

12  a listing at step three.  See, e.g., Langford v. Astrue, 2008 WL

13  2073951, at *3 (E.D. Cal. 2008) (finding that the ALJ was under

14  no obligation to incorporate the findings from the psychiatric

15  review technique in his ultimate assessment of plaintiff's RFC at

16  steps four and five); see also Lopez v. Astrue, 2008 WL 3539623,

17  at *7 (N.D. Cal. 2008) (finding the same).

18      The Court concludes that the ALJ did not commit error by not

19  including the "one or two episodes of decompensation" in his

20  determination of Plaintiff's RFC.

21  **D.   Remand is Appropriate**

22      The ALJ erred by failing to consider the lay witness

23  testimony of Plaintiff's brother, James Coleman, and by failing

24  to ascertain the effects of Plaintiff's lumbar MRI findings upon

25  the opinion of Dr. Doren.  Remand is warranted when additional

26  administrative proceedings can remedy defects in the original

27  decision.  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

28  Accordingly, remand is the proper remedy in this case.

07cv1722

**VIII.   CONCLUSION**

Based on the foregoing, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendant's Cross-Motion for Summary Judgment is **DENIED**.   Pursuant to Section 405(g) of Title 42, this case should be remanded to the Social Security Administration for further administrative proceedings consistent with the discussion above.

**IT IS SO ORDERED**.

DATED:   March 26, 2009

Hon. Jeffrey T. Miller
United States District Judge

07cv1722